# EXHIBIT A

Westlaw.

2001 WL 849700
2001 WL 849700 (W.D.Pa.)
(Cite as: 2001 WL 849700 (W.D.Pa.))

Page 1

**C**
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, W.D. Pennsylvania.

Lorena M. FINO, Plaintiff,
v.
KEY BANK OF NEW YORK, et al., Defendants.

**No. CIV. A. 00-375E.**

July 27, 2001.

MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION

CAIAZZA.

I. *RECOMMENDATION*

**\*1** For the reasons stated below, it is recommended that the District Court: *sua sponte* dismiss under Federal Rule of Civil Procedure 12(b)(6) the Plaintiff's claims against the Defendant KeyBank National Association; [FN1] and deny as moot the Defendant's Motion to Dismiss (Doc. 25).

> FN1. Although the Plaintiff's pleadings identify the relevant Defendant as "Key Bank of New York," the parties appear to agree that its correct name is "KeyBank National Association." *Compare* Mot. to Dismiss (Doc. 25) *with* Pl.'s Resp. (Doc. 27) (both identifying the Defendant as KeyBank National Association).

II. *REPORT*

*BACKGROUND*

A. *Procedural History*

The Plaintiff Lorena M. Fino ("the Plaintiff" or "Ms. Fino") filed this lawsuit on December 6, 2000, alleging violations of the Fair Credit Reporting Act,

15 U.S.C. § 1681, *et seq.* ("the FCRA" or "the Act"). *See generally* Compl. (Doc. 1). In her most recent pleadings, Ms. Fino names as Defendants two consumer reporting agencies, Experian Information Solutions, Inc., and Trans Union LLC (collectively "the Reporting Agencies"), along with KeyBank National Association ("Key Bank"), a banking institution and "furnisher[ ] of information [regarding the Plaintiff] to consumer reporting agencies." *See generally* Am. Compl. (Doc. 22) at ¶¶ 2-3, 18; *see also generally id.* at ¶ 46 (claiming that Key Bank's obligations are governed by 15 U.S.C. § 1681s-2, which addresses "[r]esponsibilities of furnishers of information to consumer reporting agencies"). [FN2]

> FN2. One other consumer reporting agency, Equifax Credit Information Service ("Equifax"), was named in the original Complaint; that entity was voluntarily dismissed by the Plaintiff on February 1, 2001. *See* Doc. 9.
>
> On April 9, 2001, and with leave of court, the Plaintiff filed an Amended Complaint. *See* Doc. 21 (Order granting leave to amend) *and* Doc. 22 (Am.Compl.). The Amended Complaint properly omits references to Equifax, but it also appears to inadvertently omit a paragraph identifying Trans Union LLC as a Defendant. *Compare* Compl. at ¶ 5 (paragraph identifying Trans Union LLC as a Defendant) *with* Am. Compl. (omitting same paragraph). Nevertheless, the Amended Complaint retains the Plaintiff's substantive allegations against Trans Union LLC, *see e.g.,* Am. Compl. at ¶ 69, so her omission of an identifying paragraph is of no consequence.

On May 8, 2001, Key Bank filed a Motion under Federal Rule of Civil Procedure 12(b)(6), seeking dismissal of the claims asserted against it in the Amended Complaint. *See* Key Bank's Mot. to Dismiss Am. Compl. (Doc. 25). The briefing on that motion has come to a close, and it is now ripe for adjudication.

In reviewing Key Bank's Motion, this magistrate judge has come to conclude that the Plaintiff cannot state claims against that Defendant upon which relief can be granted. This conclusion, however, is based on

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2001 WL 849700                                                                              Page 2
2001 WL 849700 (W.D.Pa.)
**(Cite as: 2001 WL 849700 (W.D.Pa.))**

grounds other than those specifically addressed by
Key Bank. Thus, it is recommended that the District
Court dismiss the claims against Key Bank, *sua
sponte*, under Rule 12(b)(6).

B. *Factual Background and Claims Alleged Against
Key Bank*

In the Amended Complaint, the Plaintiff alleges the
following facts relevant to her claims against Key
Bank.

In July 1994, the Plaintiff and her husband Jeffrey J.
Fino ("husband") secured a consumer vehicle loan
with Key Bank for the purchase of a vehicle. *See* Am.
Compl. at ¶ 4.

In February 1998 Ms. Fino's husband, in his sole
capacity, filed for Chapter VII bankruptcy in the
United States Bankruptcy Court for Western District
of Pennsylvania. He was awarded a discharge from
bankruptcy in May of the same year. *See id.* at ¶¶ 4-
5. Under the bankruptcy proceedings, the Plaintiff's
husband reaffirmed his debt to Key Bank, and the
Finos at all relevant times continued to make
payments on their loan with Key Bank. *See id.* at ¶¶
7-8.

On May 11, 1998, the Plaintiff learned that a
mortgage application she submitted had been denied
because a bankruptcy appeared on her credit report.
*See id.* at ¶ 10. This was true despite the fact the she
had not filed for bankruptcy and was not a party to
her husband's bankruptcy proceedings. *See generally
id.* at ¶ 5.

**\*2** On approximately May 12, 1998, Ms. Fino
contacted Key Bank by telephone to complain of the
incorrect information appearing on her credit report.
*See id.* at ¶ 11. She followed this verbal complaint
with written complaints. *See id.*

In response, Key Bank conducted an investigation
and on July 1, 1998 issued a letter to the Plaintiff and
the Reporting Agencies stating that any references to
the bankruptcy should be removed from Ms. Fino's
credit reports. *See id.* at ¶ 12. The letter incorrectly
stated, however, that her Key Bank account should be
listed as a "charge off," *i.e.,* that the account had been
"charged off as bad debt." *See id.* at ¶¶ 12-14; *see
also, e.g.,* Trans Union LLC credit report attached as
Ex. G to Original Compl.

Shortly thereafter, the Plaintiff contacted Key Bank
to complain of the  "charge off" reference in its letter.

*See* Am. Compl. at 14. On July 13, 1998, within two
weeks of its first letter, Key Bank sent a second letter
to the Plaintiff and the Reporting Agencies clarifying
that "all references to charge offs and bankruptcies
should be deleted from [Ms. Fino's] credit report and
that [her] account was active." *See id.* at ¶ 15.

In approximately November 1998, the Plaintiff came
to learn that certain of her credit reports continued to
show bankruptcy, charge off, and/or inactive account
designations. *See id.* at ¶ 18. The Plaintiff alleges
that, "[i]n response to the[se] erroneous reports, [she]
sent each [Reporting Agency] a copy of Key Bank's
letter stating that the [b]ankruptcy and charge off
information was erroneous, and asked that they
update her account." *See id.* at ¶ 20. Thereafter, she
"received confirming statements from each of the
[Reporting Agencies] ... stating that the bankruptcy
and charge[ ] off information had been removed"
from her credit reports. *See id.*

The Plaintiff alleges that, nevertheless, certain of her
credit reports issued thereafter continued to contain
the incorrect information. *See id.* at ¶ 22.
Accordingly, she telephoned Key Bank to complain
of "the persistent misinformation being reported on
her credit reports." *See id.* ¶ 23. She alleges that, in
response, Key Bank stated on January 29, 1999 that
"it would continue to report the Plaintiff's credit
information as it was currently being reported and
would not make any changes." *See id.* at ¶ 24.

On February 1, 1999, the Plaintiff filed a complaint
regarding Key Bank with the Comptroller of
Currency for the Administrator of National Banks.
*See id.* at ¶ 26. Ms. Fino alleges that "[t]he
Comptroller's investigation ended when Key Bank
issued a letter dated May 5, 1999 to both the Plaintiff
and the [Reporting Agencies] that correctly stated the
status of the Fino's [sic] account." *See id.* at ¶ 29.

Still, the Plaintiff alleges, she continued to have
problems with her credit reports. For example, Ms.
Fino was allegedly denied a credit card in October
2000 because one of the Reporting Agency's reports
"include[d] a bankruptcy." *See id.* at ¶ 34. This
allegedly was true despite the fact that, in August
1999, the loan held by Key Bank had been paid by
the Finos in full. *See id.* at ¶ 30.

**\*3** In her claims against Key Bank, the Plaintiff
alleges that the institution "[n]egligent[ly]" and/or
"[w]illful[ly]" misreported credit information
regarding her, in violation of 15 U.S.C. § § 1681s-
2(b), 1681n, and 1681o. *See generally id.* at ¶¶ 38-

66. In the Counts asserted against Key Bank, the Plaintiff states that:

• "the Plaintiff [repeatedly] notified Key Bank of the improper reporting of a bankruptcy or a bad debt charge off on her credit report";

• in July 1998, Key Bank notified each of the Reporting Agencies "that all references to charge-offs and bankruptcies should be deleted from her credit report[s]";

• upon the Plaintiff's learning that her credit reports continued to state the inaccurate information, she "sent each [Reporting Agency] a copy of Key Bank's letter stating" that the information was inaccurate and requesting that it be updated;

• upon their receipt of the Plaintiff's correspondences enclosing Key Bank's letter, the Reporting Agencies were obligated under the FCRA to notify Key Bank "of the dispute";

• "[t]he Plaintiff believes, and therefore avers, that the [Reporting Agencies] met" the notification requirement stated immediately above in October or November of 1998;

• upon receiving such notice from the Reporting Agencies, Key Bank was required under the FCRA to "conduct an investigation and report the results of [it] to the [Reporting Agencies]"; and

• "[e]ven after the Plaintiff complained to Key Bank about the misinformation appearing on her credit reports, th[e inaccurate] information continued to appear ... as recently as October ... 2000."

*See id.* at ¶ ¶ 39-40, 42-47 (stating these averments in support of negligent misreporting claim); *see also id.* at ¶ ¶ 54-55, 57-59, 62 (same for willful misreporting claim).

Based on these allegations, Ms. Fino alleges that "Key Bank has been negligent in not ensuring that the misinformation it supplied to the [Reporting Agencies] has been adequately corrected." *See id.* at ¶ 43. She states the same allegations in support her willful misreporting claim, adding that in January 1999 "Key Bank[ ] willful[ly] refus[ed] to correct the misinformation in the Plaintiff's credit report" and stated it "would continue to report her credit information as it was currently being reported...." *See id.* at ¶ ¶ 60-61.

The aforementioned allegations form the only bases for the Plaintiff's claims against Key Bank. [FN3]

> FN3. The Plaintiff also alleges FCRA claims against the Reporting Agencies, *see* Counts III and IV of Am. Compl., but those

allegations are not implicated by Key Bank's request for dismissal.

*ANALYSIS*

*1. Key Bank's Arguments for Dismissal Under Rule 12(b)(6)*

In moving for dismissal under Rule 12(b)(6), Key Bank asserts three arguments: a) that the Plaintiff's claims against it are time barred under the limitations period provisions of the FCRA; b) that Key Bank may not be liable under 15 U.S.C. § 1681s-2(b) ("Section 1681s-2(b)") "because a credit reporting agency never notified [it] that a potential error existed in [the] Plaintiff's credit report[s]"; and c) that the Plaintiff's claims fall under 15 U.S.C. § 1681s-2(a) ("Section 1681s-2(a)"), a section for which there is no private right of action.

*\*4* Having reviewed the specific arguments presented by Defense counsel in support of dismissal, this magistrate judge finds them less than entirely convincing. For reasons other that those articulated by Key Bank, however, this magistrate judge agrees that the Plaintiff's claims fall under Section 1681s-2(a), a section for which no private right of action exists. Thus, the District Court should *sua sponte* dismiss the Plaintiff's claims against Key Bank under Rule 12(b)(6) and deny as moot the Defendant's other, less convincing arguments for dismissal.

2. The FCRA Provisions Governing the Duties of "[F]urnishers of [I]nformation to [C]onsumer [R]eporting [A]gencies"

On September 30, 1997, well before the incidents giving rise to this litigation, new provisions of the FCRA went into effect governing the "[r]esponsibilities of furnishers of information to consumer reporting agencies." *See* § 1681s-2; *see also Ryan v.. Trans Union Corp.,* 2001 WL 185182, *\*3* (N.D.Ill. Feb. 26, 2001) (unpublished opinion) (noting that same provisions went into effect on September 30, 1997). These provisions, codified under Section 1681s-2, identify two general types of obligations owed by furnishers: those addressing their duty "to provide accurate information" to credit reporting agencies, as stated in Section 1681s-2(a); and their duty under Section 1681s-2(b), upon receiving notice of consumer disputes from reporting agencies, to investigate said disputes and report the results to consumer reporting agencies.

Regarding the first class of duties, Section 1681s-2(a) provides in relevant part:

A [furnisher] shall not furnish information ... to any consumer reporting agency if ... the [furnisher] has been notified by the consumer ... that [the] specific information is inaccurate ... and ... the information is, in fact, inaccurate ... and ... the information is, in fact, inaccurate ...

....

A [furnisher] who ... has furnished to a consumer reporting agency information that the [furnisher] determines is not complete or accurate [, moreover,] ... shall promptly notify the consumer reporting agency of that determination ... and shall not thereafter furnish to the agency any of the information that remains not complete or accurate. See § § 1681s-2(a)(1)(B), 1681s-2(a)(2).

The FCRA dictates that these and the other provisions of Section 1681s-2(a) are to be "enforced exclusively ... by the Federal agencies and officials and [certain] State officials...." See § 1681s-2(d). Under this provision, the Act "grants *the FTC exclusive enforcement power over* " Section 1681s-2(a), and "*there is no private right of action* for a violation of" the Section. See *Olexy v. Interstate Assurance Co.,* 113 F.Supp.2d 1045, 1047 (S.D.Miss.2000) (citations and internal quotations omitted, emphasis added); *Quigley v. Pennsylvania Higher Educ. Assistance Agency,* 2000 WL 1721069, *2 (N.D.Cal. Nov. 08, 2000)* (unpublished opinion) (same).

**\*5** Regarding the second type of duties owed by furnishers, those regarding the duty to investigate consumer disputes, Section 1681s-2(b) provides in relevant part:

After receiving notice pursuant to section 1681i(a)(2)[, which requires a consumer reporting agency to notify the furnisher regarding customer disputes within five days of the reporting agency's receiving notification from the consumer of the same,] ... the [furnisher] shall--

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency ...;

(C) report the results of the investigation to the consumer reporting agency; and

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the [furnisher has] furnished the information....

See § 1681s-2(b)(1).

Most of the courts considering the issue have concluded that Section 1681s-2(b), unlike Section 1681s-2(a), may form the basis for a private cause of action, so long as the plaintiff shows that the furnisher "received notice from a *consumer reporting agency,"* as opposed to the plaintiff alone, "that the credit information is disputed." *See, e.g., Dornhecker v. Ameritech Corp.,* 99 F.Supp.2d 918, 928-29 (N.D.Ill.2000) (emphasis in original) (dismissing without prejudice the plaintiff's claim under 1681s-2(b) because his pleadings alleged that he, not a consumer reporting agency, notified the furnisher of the dispute). [FN4]

> FN4. Although Key Bank argues that Section 1681s-2(b) does not apply "because a credit reporting agency never notified [it] that a potential error existed in [the] Plaintiff's credit report[s]," *see* discussion *supra* at 8, the Plaintiff states upon information and belief that the Reporting Agencies provided such notice. *See id.* at 7. In addition, she claims to have notified the Reporting Agencies of the continued errors when she "sent each [of them] a copy of Key Bank's [previously issued] letter stating" that the information in question was inaccurate. *See id.* at 6. If the Plaintiff could otherwise state a claim under Section 1681s-2(b), her statements on information and belief that the Reporting Agencies notified Key Bank of a dispute would suffice at this stage in the litigation. *See, e.g., Jaramillo v. Experian Info. Solutions, Inc.,* 2001 WL 568988, *6 (E.D.Pa. May 21, 2001)* (unpublished opinion) (holding same and stating: "When [the plaintiff] filed this complaint, [he] could not have known whether [reporting agencies] had forwarded the inaccurate information to [the furnisher].... When this information is provided to [the] plaintiff in discovery, it will become clear whether [he] has a cause of action against [the furnisher under Section 1681s-2(b) ], or solely against the credit reporting agencies."). Nevertheless, the Plaintiff's claims against Key Bank fall squarely within provisions stated in Section 1681s-2(a), and therefore they should be dismissed.

The District Court need not reach the issue of whether a private claim can be stated under Section 1681s-2(b). This is true because, based on the facts described in the Amended Complaint, the Plaintiff's

claims undeniably fall within provisions stated in Section 1681s-2(a).

As noted above, the Plaintiff alleges that she first contacted Key Bank directly in May 1998 to complain of the inaccurate information being communicated in the Reporting Agencies' reports. *See* discussion *supra* at 4. She also expressly alleges that, within approximately two months of her first complaint to Key Bank, the Defendant had conducted an investigation of the matter and issued a letter to the Reporting Agencies stating that "*all references to charge-offs and bankruptcies should be deleted from her credit report[s] ....*" *See id.* (emphasis added). The remainder of her allegations, then, address either: (a) Key Bank's failure thereafter to "ensur[e] that the misinformation it supplied ... ha[d] been adequately corrected," *see id.;* or (b) the Defendant's having continued to report the inaccurate information to the Reporting Agencies, despite its previously having detected and reported the error. *See* Am. Compl. at ¶ 60 ("On January 29, 1999, the Plaintiff was informed by ... Key Bank ... that [it] would continue to report her credit information as it was currently being reported and would not make any changes."). [FN5]

> FN5. The Plaintiff's allegation that Key Bank represented it "would continue to report her credit information as it was currently being reported" is ambiguous, at best. The Plaintiff alleges that, in July 1998, Key Bank recognized and reported to the Reporting Agencies that references to bankruptcy or charge offs were erroneous and should be removed from Ms. Fino's credit reports. *See* discussion *supra* at 4. Thus, if this was how the Plaintiff's credit was "currently being reported," then Key Bank acted properly in continuing to make such reports. Nevertheless, the court is obligated to read all reasonable inferences in favor of the Plaintiff, and other averments may be read to infer that Key Bank continued to mis-report the information that was previously investigated and learned to be incorrect. *See, e.g.,* Am. Compl. at ¶ 47 ("Even after the Plaintiff complained about the misinformation appearing on her credit reports, this information continued to appear for more than two years...."). Indeed, the Plaintiff's briefing in opposition to dismissal relies on such an inference. *See* Pl.'s Br. in Opp'n to Key Bank's Mot. to Dismiss (Doc. 28, hereinafter cited as "Pl.'s Opp'n Br.") at

12 ("it is likely that ... Key Bank ... continued to issue false information regarding the loan to which [the Plaintiff] was a party").

**\*6** These claims, as well as the alleged facts leading up to them, fall squarely within the provisions of Section 1681s-2(a). As noted above Section 1681s-2(a) provides that, if a furnisher "*has been notified by the consumer* " that information regarding the consumer "is inaccurate" and "*the information is, in fact, inaccurate,*" the furnisher shall not provide it to any credit reporting agency. *See id.,* § 1681s-2(a)(1)(B)(i)-(ii) (emphasis added). This provision describes exactly what happened in the instant case. The Plaintiff's own pleadings assert that, when she first learned that Key Bank was reporting incorrect information, she notified the institution of the same. *See* Am. Compl. at ¶ 11. Within two months of her first contact, Key Bank issued a letter to the Reporting Agencies "stating that all references to charge-offs and bankruptcies should be deleted from her credit report[s]." *See id.* at ¶ 15.

What happened thereafter is also governed by Section 1681s-2(a). The Section contains provisions specifically addressing a furnisher's "[d]uty to correct and update information," which state:

> A [furnisher] who ... has furnished to a consumer reporting agency *information that the [furnisher] determines is not complete or accurate ... shall promptly notify the consumer reporting agency of that determination* ... and *shall not thereafter furnish to the agency any of the information that remains not complete or accurate.*
> *See* § 1681s-2(a)(2) (emphasis and double-emphasis added).

Key Bank's duties to correct information it determined to be inaccurate, and to refrain from continuing to report such known, inaccurate information, are expressly addressed by the above-quoted provisions. *See id.* Unfortunately for the Plaintiff, though, the enforcement of these provisions is exclusively reserved to the FTC; there is no private right of action. *See Olexy,* 113 F.Supp .2d at 1047.

Recognizing that a private claim under Section 1681s-2(a) fails, the Plaintiff attempts to "shoehorn" her claims against Key Bank into Section 1681s-2(b). *See* Am. Compl., Counts I & II (alleging violations of Section 1681s-2(b)). [FN6] Specifically, Plaintiff's counsel looks to the provisions in Section 1681s-2(b) that require a furnisher, upon notice from a reporting

agency, to investigate consumer disputes and report the results to reporting agencies. *See generally, e.g.,* Am. Compl. at ¶¶ 43-46.

> FN6. Although the Plaintiff's Amended Complaint also makes reference to <u>Sections 1681n</u> and <u>1681o</u>, those provisions do not provide an inroad to liability for Key Bank. <u>Section 1681s-2(c)</u> specifically states that, except under circumstances not presented here, "<u>Sections 1681n</u> and <u>1681o</u> ... do not apply to any failure to comply with" <u>Section 1681s-2(a)</u>. *See* <u>§ 1681s-2(c)</u> (*citing* <u>Section 1681(c)(1)(B)</u> as only exception to nonapplicability of <u>Sections 1681n</u> and <u>1681o</u>); *see also* <u>§ 1681(c)(1)(B)</u> (addressing "*State action[s]*" for violations" of the FCRA) (emphasis added).

In this magistrate judge's opinion, the Plaintiff's attempt to massage her averments into <u>Section 1681s-2(b)</u> tortures the plain language of the Act. Plaintiff's counsel would have the court view her alleged complaints to the Reporting Agencies, regarding inaccuracies already detected and reported by Key Bank, as implicating a new duty to investigate. What precisely Key Bank was to investigate, when it had already reviewed the Plaintiff's information in July 1998 and notified the Reporting Agencies it was inaccurate, is beyond the court's comprehension.

**\*7** This is not to say that Key Bank's actions, as alleged by the Plaintiff, were in full compliance with the FCRA. Ms. Fino expressly avers that the Defendant was negligent in "not ensuring that the misinformation it supplied to the [Reporting Agencies] ha[d] been *adequately corrected,*" and she implicitly asserts that Key Bank willfully "*continued to issue false information* " after learning of its errors. *See* Am. Compl. at ¶ 43 (emphasis added) *and* Pl.'s Opp'n Br. at 12 (emphasis added). But the FRCA provisions addressing Key Bank's "[d]uty to *correct and update information* " and to "*not [continue] ... furnish [ing] ... information that remain[ed] not complete or accurate* " fall under <u>Section 1681s-2(a)</u>, a section for which there is no private right of action. *See* <u>§ § 1681s-2(a)(1)(B)</u>, <u>1681s-2(a)(2)</u> (emphasis added); *see also* <u>§ 1681s-2(d)</u>.

Plaintiff's counsel also appears to urge that, under the circumstances presented here, equity compels the recognition of Ms. Fino's right to a private action. *See generally* Pl.'s Opp'n Br. at 15 (stating that Key

Bank's "attempt to claim that it should not be held responsible for subsequent false reports would" result in "manifest injustice"); *see also id.* at 16-18 (arguing that Key Bank should be equitably estopped from denying liability under the Act). Regardless of the equities, however, the court is not at liberty to rewrite the statute to manufacture a private right of action against this Defendant. To ignore the provisions in <u>Section 1681s-2(a)</u> expressly addressing the duties allegedly breached by Key Bank would be to disregard the "well-settled canon of statutory construction that courts should *disfavor interpretations of statutes that render language superfluous.*" *See* <u>U.S. v. Voigt,</u> 89 F.3d 1050, 1087 (3d Cir.1996) (citation and internal quotations omitted, emphasis added).

Simply stated, under any possible reading of the Amended Complaint, <u>Section 1681s-2(a)</u> squarely addresses the duties allegedly breached by Key Bank. The enforcement of that Section is reserved exclusively to an agency of the federal government. Thus, the Plaintiff's claims against Key Bank should be dismissed.

3. *A Sua Sponte Dismissal of the Plaintiff's Claims Against Key Bank Is Permissible Because this Report and Recommendation Provides Her Notice of the Potential Dismissal and an Adequate Opportunity to Respond.*

As noted above, the basis for this magistrate judge's recommendation of dismissal differs from those specifically identified by Key Bank. Accordingly, the recommended dismissal, if adopted, should be made *sua sponte.*

The Court of Appeals for the Third Circuit has recognized that "there are times when a court may *sua sponte* raise the issue of the deficiency of a pleading under <u>Rule 12(b)(6)</u>," provided the litigant is afforded "notice and an opportunity to respond." *See* <u>Roman v. Jeffes,</u> 904 F.2d 192, 196 (3d Cir.1990) (citations omitted); *cf. also* <u>Otis Elevator Co. v. George Washington Hotel Corp.,</u> 27 F.3d 903, 910 (3d Cir.1994) (district court must "give[ ] notice and an opportunity to oppose summary judgment" before entering summary judgment *sua sponte* ). This is one of those times, as the Plaintiff cannot state claims against Key Bank upon which relief may be granted.

**\*8** Regarding notice, this Report and Recommendation undoubtedly notifies Plaintiff's counsel of the District Court's potential *sua sponte* dismissal. With respect to the Plaintiff's opportunity

2001 WL 849700
2001 WL 849700 (W.D.Pa.)
**(Cite as: 2001 WL 849700 (W.D.Pa.))**

to respond, this magistrate judge will extend the period for filing objections to the Report and Recommendation. Accordingly, the court is satisfied that the requisite notice and opportunity to respond have been provided. [FN7]

> FN7. This magistrate judge notes that other federal courts have sanctioned use of the report and recommendation procedures to fulfill the notice and response requirements in connection with *sua sponte* rulings. *See, e.g., United States v. Lee,* 145 F.3d 1347, 1998 WL 292388, *2 (10th Cir. May 28, 1998)* (unpublished opinion) (finding that objections to report and recommendation provided party "ample opportunity to respond" to potential *sua sponte* ruling).

*CONCLUSION*

For the reasons stated above, it is recommended that the District Court *sua sponte* dismiss the Plaintiff's claims against the Defendant KeyBank National Association under Federal Rule of Civil Procedure 12(b)(6), and deny as moot that Defendant's Motion to Dismiss (Doc. 25).

Under the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, objections to this Report and Recommendation would be due by August 13, 2001.

Because this magistrate judge has recommended a *sua sponte* dismissal, however, the deadline for filing objections is hereby extended until August 22, 2001. Responses to objections are due by September 3, 2001.

2001 WL 849700 (W.D.Pa.)

Motions, Pleadings and Filings (Back to top)

• 1:00CV00375 Docket)
(Dec. 06, 2000)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT B

Westlaw.

Slip Copy
2004 WL 1729871 (D.Minn.)
**(Cite as: 2004 WL 1729871 (D.Minn.))**

Page 1

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.

Phillip Sheridan DANIELSON, Plaintiff,
v.
EXPERIAN INFORMATION SOLUTIONS INC.;
Equifax, Inc. d/b/a Equifax Information
Services, Inc.; Trans Union LLC; CSC Credit
Services Inc .; and Aurora Loan
Services, Inc., Defendants.

**No. Civ. 03-2820 JNEJSM.**

July 30, 2004.

Thomas J. Lyons, Jr., Consumer Justice Center, for
Plaintiff Phillip Sheridan Danielson.

Scott M. Lucas, Thomas B. Olson & Associates,
P.A., for Defendant Aurora Loan Services, Inc.

ORDER

ERICKSEN, J.

*1 This is an action by a consumer--Phillip
Danielson (Mr. Danielson)-- against his mortgagee-
Aurora Loan Services, Inc. (Aurora)--and several
credit reporting agencies--Experian Information
Solutions Inc. (Experian), Equifax, Inc., Trans Union
LLC, and CSC Credit Services Inc. (CSC)
(collectively, CRAs). He settled his claims against
the CRAs. [FN1] He asserts a claim against Aurora
under the Fair Credit Reporting Act (FCRA), 15
U.S.C. § § 1681-1681u (2000). He also asserts
claims against Aurora under state law for credit
defamation, invasion of privacy, interference with
credit expectancy, and negligence. The case is before
the Court on Aurora's Motion for Summary Judgment
and Mr. Danielson's Motion for Partial Summary
Judgment on FCRA Liability and Willfulness. For
the reasons set forth below, the Court grants Aurora's
motion and denies Mr. Danielson's motion.

> FN1. Pursuant to stipulations, the Court
> dismissed Mr. Danielson's claims against

Experian, Trans Union, and CSC. In his
memorandum in support of his motion for
partial summary judgment, Mr. Danielson
states that he settled with all defendants
except Aurora. Accordingly, the Court
dismisses the claims against Equifax.

I. BACKGROUND

In February 1994, Mr. Danielson and his wife,
Elizabeth Danielson (Mrs. Danielson), executed a
mortgage note and mortgage deed in favor of
Freedom Mortgage Corporation. Mrs. Danielson was
the "secondary borrower." Later, the Danielsons'
mortgage was assigned to Aurora. In October 2001,
Mrs. Danielson petitioned for Chapter 13 bankruptcy.
Aurora appeared in the petition's schedule of
creditors holding secured claims and the schedule of
codebtor's creditors. Mrs. Danielson also filed a
Chapter 13 plan in October 2001. The plan listed the
obligation to Aurora as a "long-term secured claim[ ]
not in default," indicated that payments to Aurora
were current, and stated that Mrs. Danielson intended
to make payments directly to Aurora. Under the plan,
Aurora would retain its lien. In November 2001,
Aurora received notice of Mrs. Danielson's Chapter
13 bankruptcy case.

Aurora submits monthly reports about its clients to
the CRAs. As of October 2001, Aurora reported the
Danielsons' account in good standing. After receiving
notice of Mrs. Danielson's Chapter 13 bankruptcy
case, Aurora changed its monthly report for the
Danielsons' account. From November 2001 to
November 2003, Aurora reported the Danielsons'
account as Bankruptcy Chapter 13 and indicated that
the secondary borrower was in bankruptcy.

After Aurora changed its monthly report for the
Danielsons' account, the CRAs received disputes
from Mrs. Danielson about their reporting of the
Aurora account on Mr. Danielson's credit report. Mrs.
Danielson also contacted Aurora directly. The Court
summarizes these events below.

A. CSC/Equifax [FN2]

> FN2. According to Mr. Danielson, Equifax
> is affiliated with CSC. He does not
> distinguish CSC from Equifax in his factual

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

recitation. Nor does Aurora. Accordingly, the Court considers them together.

As of March 29, 2002, CSC listed Aurora's account on Mr. Danielson's credit report as "included in bankruptcy of secondary borrower" and "involved in chapter 13 debt adj." By letter dated July 2, 2002, Mrs. Danielson submitted the following request to Equifax:

> I am requesting that when credit information is provided to any company seeking information about my husband ONLY, it is clearly noted that the Chapter 13 was filed in my name only, not jointly with my husband. I understand that since our mortgages are a joint venture, this information needs to be provided, however, I would appreciate complete information be indicated. The fact that my husband did not file Chapter 13 should be conveyed.

*2 An Automated Consumer Dispute Verification form (ACDV) _[FN3]_ dated July 15, 2002, reveals that Equifax submitted the following verification request to Aurora with regard to Mr. Danielson's credit report: "Subscriber comment/remarks message disputed. Not in bankruptcy--requests message deletion." The ACDV contains Aurora's response: "Please report secondary borrower filed bankruptcy solely ." As of July 25, 2002, CSC listed Aurora's account on Mr. Danielson's credit report as follows: "Account included in bankruptcy of secondary borrower."

> FN3. Upon receiving a dispute from a consumer, a credit reporting agency notifies the information furnisher of the dispute in a Consumer Dispute Verification form or ACDV. A completed ACDV contains the credit reporting agency's request for verification and the information furnisher's response.

By letter of August 20, 2002, Mrs. Danielson informed CSC that the information provided by Aurora was incorrect. Specifically, she stated: "[Aurora's] statement of 'account included in bankruptcy of secondary borrower' is not entirely correct. This debt was NOT included in the Chapter 13 Bankruptcy and [Aurora is] not included in the repayment plan established, that is for unsecured debts only." The record does not contain an ACDV for this dispute. By letter dated September 5, 2002, CSC informed Mr. Danielson of the results of its investigation. Specifically, CSC stated that the Aurora account "is currently not reporting in bankruptcy." CSC also removed the information to which Mrs. Danielson had objected from Mr. Danielson's credit report.

In early 2003, the Danielsons again disputed the reporting of the Aurora account on Mr. Danielson's credit report. An ACDV dated February 5, 2003, contains the following verification request from CSC: "Subscriber comments/remarks message disputed." On narrative lines, the ACDV also states that the Aurora account was "included in bankruptcy of secondary borrower" and that it was "involved in chapter 13 debt adj." Aurora responded: "Please report active chapter 13 bankruptcy account current." By letter dated March 17, 2003, CSC informed Mr. Danielson that it had deleted the Aurora account from his credit report.

B. Experian

By letter dated July 2, 2002, Mrs. Danielson submitted the same request to Experian that she had submitted to CSC/Equifax. The record does not contain an ACDV for this dispute. After investigation, Experian reported the Aurora account on Mr. Danielson's credit report as follows:

> Status: Discharged through Bankruptcy Chapter 13/Never late.
>
> Account history: Debt included in Chapter 13 Bankruptcy 11/06/2001 to 07/06/2002
>
> The account is scheduled to continue on record until 10-2008.
>
> Creditor's statement: *"Secondary borrower filed bankruptcy."*

By letter of August 20, 2002, Mrs. Danielson disputed Experian's reporting of the Aurora account on Mr. Danielson's credit report. Specifically, she stated:

> The report indicates: Status: discharged through Bankruptcy Chapter 13/Never late. This debt was NOT included in the Chapter 13 Bankruptcy, as that is for unsecured debts only and payments to [Aurora] are not included in the Chapter 13 repayment plan. The Never late statement is a true statement....

*3 An ACDV dated September 5, 2002, contains the following verification request from Experian to Aurora: "disputes present/prev status/mop rating/paymnt patter. pls verify all curr/prev paymnt history." Aurora responded: "debt included in bankruptcy chapter 13." A credit report dated September 6, 2002, indicates that Experian reported the Aurora account on Mr. Danielson's credit report

as follows:

Status: Discharged through Bankruptcy Chapter 13/Never late.

Account history: Debt included in Chapter 13 Bankruptcy 11/06/2001 to 08/06/2002

The account is scheduled to continue on record until 10-2008.

Creditor's statement: *"Secondary borrower filed bankruptcy."*

This item was verified on 7-2002 and remained unchanged.

After another dispute arose in early 2003, Experian reported the Aurora account on Mr. Danielson's credit report as follows:

Status: Open/Never late.

This item was verified and updated on 2-2003.

### C. Trans Union

As of March 28, 2002, Trans Union listed the Aurora account on Mr. Danielson's credit report as "included in bankruptcy" and "status as of 11/2001: wage earner or similar plan." By letter dated July 2, 2002, Mrs. Danielson submitted the same request to Trans Union that she had submitted to CSC/Equifax and Experian. An ACDV dated July 19, 2002, indicates that Trans Union sent the following verification request to Aurora: "bankruptcy not his, verify consumer liability." Aurora responded: "please update secondary borrower filed bankruptcy solely." As of July 26, 2002, Trans Union reported the Aurora account on Mr. Danielson's credit report as "included in bankruptcy" and "sbbsecobndary borrowe bkrpy." By letter dated August 20, 2002, Mrs. Danielson disputed the information about the Aurora account on Mr. Danielson's credit report. The letter provides in part: "This debt was not included in the Chapter 13 bankruptcy, as that is for unsecured debts only. [Aurora's] further statement of 'wage earner or similar plan' is also incorrect." An ACDV dated September 17, 2002, reveals that Trans Union sent the following verification request to Aurora: "never included in wep." It indicates that Aurora responded: "please update this account is a ch 13 bankruptcy." As of September 24, 2002, Trans Union reported Aurora's account on Mr. Danielson's credit report as follows: "chapter 13 bankruptcy," "sbbsecobndary borrowe bkrpy," and "status as of 9/2002: wage earner of similar plan."

### D. Aurora

By letter dated August 21, 2002, the Danielsons informed Aurora of how the CRAs were reporting the Aurora account on Mr. Danielson's credit report.

They asked Aurora for a 12-month history of their account and a statement verifying that the Aurora account is not part of the Chapter 13 repayment plan. In a letter dated October 9, 2002, Aurora provided a 12-month account history to the Danielsons. Aurora also stated that it was monitoring the bankruptcy case, that no arrears were included with Aurora's Proof of Claim, and that the Chapter 13 Bankruptcy plan states that payments to Aurora come directly from the Danielsons.

### II. DISCUSSION

**\*4** Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

### A. Mr. Danielson's motion

Mr. Danielson contends that Aurora violated the FCRA. A negligent failure to comply with the FCRA entitles an aggrieved consumer to actual damages. 15 U.S.C. § 1681o. A willful failure to comply with the FCRA entitles an aggrieved consumer to actual or statutory damages and punitive damages. *Id.* § 1681n. The particular provision of the FCRA that Aurora allegedly violated is 15 U.S.C. § 1681s-2(b), which provides in relevant part:

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall--
(A) conduct an investigation with respect to the disputed information;

Slip Copy
2004 WL 1729871 (D.Minn.)
(Cite as: 2004 WL 1729871 (D.Minn.))

Page 4

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency; and

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

15 U.S.C. § 1681s-2(b)(1). [FN4] The investigation required by section 1681s-2(b)(1) must be reasonable. *Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426, 430-31 (4th Cir.2004). Mr. Danielson asserts that he is entitled to summary judgment on the issues of whether Aurora failed to comply with section 1681s-2(b)(1) and whether its failure to do so was willful.

> FN4. After Mr. Danielson commenced this action, section 1681s-2(b)(1) was amended to add a new provision that imposes additional duties on furnishers of information to credit reporting agencies. *See* Fair and Accurate Credit Transactions Act of 2003, Pub.L. No. 108-159, sec. 314(b), 117 Stat.1952, 1995-96. Mr. Danielson's FCRA claim does not depend on that provision.

Mr. Danielson asserts that Aurora failed to comply with section 1681s-2(b)(1) because it failed to reasonably investigate the disputes from the CRAs. According to Mr. Danielson, Aurora failed to reasonably investigate the disputes because its responses to the CRAs "failed to identify completely and accurately ... that [he] was not the borrower in bankruptcy and that the [Aurora] account was not included in his or anyone's Chapter 13 plan." He argues that no reasonable factfinder could conclude that Aurora performed a reasonable investigation because the ACDVs indicated that the CRAs were not reporting whether Mr. Danielson was the "secondary borrower," Aurora knew that the omission of that information was the precise basis of his dispute, Mrs. Danielson had contacted Aurora to inform it of the nature of the dispute, and Aurora's responses on the ACDVs failed to indicate that Mr. Danielson was not the secondary borrower. Mr. Danielson's arguments reveal that his FCRA claim is one that challenges the accuracy and completeness of the information provided by Aurora to the CRAs. The

FCRA imposes a duty on those who furnish information to a consumer reporting agency to provide complete and accurate information. 15 U.S.C. § 1681s-2(a). Unfortunately for Mr. Danielson, the FCRA provides that section 1681s-2(a) "shall be enforced exclusively" by federal and state authorities. 15 U.S.C. § 1681s-2(d). Therefore, Mr. Danielson's FCRA claim must be dismissed. *See id.; Johnson,* 357 F.3d at 433.

**\*5** Assuming that section 1681s-2(d) does not bar Mr. Danielson's FCRA claim, Aurora contends that the record does not support the claim's premise because Aurora identified Mr. Danielson as the primary borrower and Mrs. Danielson as the secondary borrower in its monthly reports to the CRAs before and after the disputes regarding Mr. Danielson's credit report. To support its contention, Aurora relies on Melissa Segura, a Default Reporting Supervisor at Aurora, and Leo Trautman, Jr., Aurora's representative under Federal Rule of Civil Procedure 30(b)(6). Mr. Danielson asserts that neither Segura nor Trautman has personal knowledge of the information sent by Aurora to the CRAs in the monthly reports. According to Segura, Aurora's records of its monthly reports to the CRAs identify Mr. Danielson as the primary borrower and Mrs. Danielson as the secondary borrower. Trautman testified that the records of the monthly reports were a "fair representation" of the information provided to the CRAs. On this record, no genuine issue of material fact exists as to whether Aurora identified Mr. Danielson as the primary borrower and Mrs. Danielson as the secondary borrower in its monthly reports to the CRAs. Aurora's reference to the secondary borrower in its verification responses was a reference to Mrs. Danielson. The record therefore does not support the premise of Mr. Danielson's FCRA claim.

In short, Mr. Danielson is not entitled to summary judgment on the issue of whether Aurora violated section 1681s-2(b)(1). In light of this conclusion, he is not entitled to summary judgment on the issue of whether Aurora's alleged violation was willful. Accordingly, the Court denies Mr. Danielson's motion.

B. Aurora's motion

*1. FCRA*

Aurora argues that it is entitled to summary judgment on Mr. Danielson's FCRA claim because there is no evidence in the record that it negligently

or willfully failed to comply with the requirements imposed by section 1681s- 2(b). In response, Mr. Danielson reiterates the arguments that he raised in support of his motion for partial summary judgment. For the reasons set forth above, section 1681s-2(d) bars Mr. Danielson's FCRA claim. Assuming that section 1681s-2(d) does not bar the claim, the record does not support the claim's premise. Accordingly, the Court grants Aurora's motion insofar as Aurora seeks summary judgment on the FCRA claim.

*2. State-law claims*

Aurora asserts that it is entitled to summary judgment on Mr. Danielson's claims of defamation, invasion of privacy, and negligence because the FCRA preempts them. Aurora relies on 15 U.S.C. § 1681h(e), [FN5] which provides:

> FN5. The FCRA contains another preemption provision, 15 U.S.C. § 1681t(b)(1)(F), that appears to overlap with section 1681h(e). *See Malm v. Household Bank (SB), N.A.,* Civ. No. 03-4340, 2004 WL 1559370, at *5- 6 (D.Minn. July 7, 2004) (summarizing judicial interpretations of the "seemingly overlapping" preemption provisions of the FCRA). Aurora does not assert that Mr. Danielson's state-law claims are preempted pursuant to 15 U.S.C. § 1681t(b)(1)(F). In the absence of such an argument, the Court considers only section 1681h(e).

Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

*6 A statement made with knowledge that it was false or with reckless disregard of whether it was false is one that is made with "malice or willful intent to injure" for purposes of section 1681h(e). *Thornton v. Equifax, Inc.,* 619 F.2d 700, 705 (8th Cir.1980);

*Yutesler v. Sears Roebuck & Co.,* 203 F.Supp.2d 1209, 1212 (D.Minn.2003).

Aurora asserts that there is no evidence in the record that it made any reports to the CRAs with knowledge that they were false or with reckless disregard of their veracity. Mr. Danielson contends that a reasonable jury could conclude that Aurora's reports exhibited a reckless disregard of their truth. His contention is based on Aurora's alleged failure to specify that the bankruptcy reference on his credit report did not apply to him. As set forth above, the record reveals that Aurora identified Mr. Danielson as the primary borrower and Mrs. Danielson as the secondary borrower in monthly reports to the CRAs before and after the disputes regarding Mr. Danielson's credit report. Aurora's reference to the secondary borrower in its verification responses identified Mrs. Danielson as the person who had filed Chapter 13 bankruptcy. Viewed in the light most favorable to Mr. Danielson, the record reveals that Aurora did not provide false information with malice or willful intent to injure Mr. Danielson. The Court therefore concludes that Aurora is entitled to summary judgment on his claims of defamation, invasion of privacy, and negligence. *See* 15 U.S.C. § 1681h(e).

*3. Interference with credit expectancy*

Although Minnesota does not recognize a cause of action for interference with credit expectancy, this Court has interpreted such a claim as one for interference with economic expectancy. *Reed v. Experian Info. Solutions, Inc.,* Civ. No. 02-3706, 2004 WL 1368405, at *7 (D.Minn. Apr. 14, 2004); *Mattice v. Equifax, Inc.,* Civ. No. 03-1060, 2003 WL 21391679, at *4 (D. Minn. June 13, 2003). Here, Aurora allegedly interfered with Mr. Danielson's economic expectancy by failing to specify that the bankruptcy reference on his credit report did not apply to him. As stated above, the record reveals that Aurora identified Mr. Danielson as the primary borrower in its monthly reports to the CRAs. Aurora's reference to the secondary borrower in its verification responses was a reference to Mrs. Danielson. Accordingly, the Court concludes that Aurora is entitled to summary judgment on this claim.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Mr. Danielson's claims against Equifax are DISMISSED.

Slip Copy
2004 WL 1729871 (D.Minn.)
**(Cite as: 2004 WL 1729871 (D.Minn.))**

2. Aurora's Motion for Summary Judgment [No Docket No.] is GRANTED.

3. Mr. Danielson's Motion for Partial Summary Judgment on FCRA Liability and Willfulness [Docket No. 52] is DENIED.

4. Mr. Danielson's Complaint [Docket No. 1] is DISMISSED.

LET    JUDGMENT    BE    ENTERED ACCORDINGLY.

2004 WL 1729871 (D.Minn.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT C

Westlaw.

Slip Copy                                                                                          Page 1
2004 WL 1638250 (W.D.La.)
**(Cite as: 2004 WL 1638250 (W.D.La.))**

Only the Westlaw citation is currently available.

United States District Court,
W.D. Louisiana.

Larry E. CARRIERE, II
v.
PROPONENT FEDERAL CREDIT UNION

**No. Civ.A.03-1894.**

July 12, 2004.

David Szwak and Mary Winchell, Bodenheimer,
Jones, Szwak & Winchell, LLP, for Plaintiff.

Brandon Black, Taylor, Porter, Brooks & Phillips,
LLP, for Proponent Federal Credit Union f/k/a HLR
Federal Credit Union.

*REPORT AND RECOMMENDATION ON MOTION
TO DISMISS*

HILL, Magistrate J.

**\*1** Pending before the undersigned for report and
recommendation is the Motion to Dismiss Pursuant to
Fed.R.Civ.P. 12(b)(6) filed by Proponent Federal
Credit Union ("Proponent"). (Document No. 11).
Plaintiff, Larry E. Carriere, II ("Carriere"), has filed
opposition. For the following reasons, it is
recommended that the motion be GRANTED IN
PART AND DENIED IN PART.

*Motion to Dismiss Standard*

In ruling on a motion to dismiss for failure to state a
claim under Rule 12(b)(6), the Court must liberally
construe the complaint in favor of the plaintiff,
assuming all factual allegations to be true. *Oliver v.
Scott,* 276 F.3d 736, 740 (5th Cir.2002); *Leleux v.
United States,* 178 F.3d 750, 754 (5th Cir.1999). A
complaint may not be dismissed "unless it appears
beyond doubt that the plaintiff can prove no set of
facts in support of his claim which would entitle him
to relief." *Id.* (quoting *Lowrey v. Texas A & M Univ.
Sys.,* 117 F.3d 242, 247 (5th Cir.1997)).

*Background*

In July, 1994, [FN1] Carriere opened a revolving
credit extension with Proponent under account
number 443015148008. (Complaint, ¶ 7).
Subsequently, he co-signed an installment credit
extension for a car loan under account number
2906700L in December, 1994 (the "first car loan").
(Complaint, ¶ 8). In May, 1996, Carriere opened an
installment credit extension for a second car loan
under account number 2906700L (the "second car
loan"). (Complaint, ¶ 9).

> FN1. While the Complaint states the year as
> 1996, this date is inconsistent with the
> subsequent dates for Carriere's obtaining
> loans on that account. Based on the facts as
> stated, it appears that the actual date for
> opening this revolving credit extension is
> 1994, rather than 1996. This discrepancy
> does not affect defendant's prescription
> claim.

In November, 1996, Carriere became more than 30
days delinquent on account number 443015148008,
and was 150 days delinquent by October, 1997.
(Complaint, ¶ ¶ 10, 11). While Carriere was
occasionally delinquent on the first car loan, he
eventually paid it off in full in mid-1998. (Complaint,
¶ ¶ 12, 13). In March, 1997, he became more than 30
days delinquent on the second car loan, and was 150
days delinquent by October, 1997. (Complaint, ¶ ¶
14, 15).

In October, 1997, Carrier filed for bankruptcy under
Chapter 7. (Complaint, ¶ 16). The two unpaid
Proponent accounts were included in the bankruptcy.
(Complaint, ¶ 17). Because these two debts were
scheduled, Proponent received notice of the
bankruptcy. (Complaint, ¶ 18).

A discharge order was entered by the bankruptcy
court in January, 1998. (Complaint, ¶ 19). After the
discharge, Proponent continued to report account
number 44301518008 as a "charged off" debt since
January, 1998 to date, and the second car loan as a
"charged off" debt since November, 1999 to date.
(Complaint, ¶ ¶ 20, 21). Additionally, despite
Carriere's payment in full for the first car loan,
Proponent began reporting that it had not received
two payments of $313.00 each, and that it had

Slip Copy
2004 WL 1638250 (W.D.La.)
**(Cite as: 2004 WL 1638250 (W.D.La.))**

"charged off" $626.00 against him. (Complaint, ¶ 22).

On August 30, 2002, a credit reporting agency ("CRA"), Experian Information Solutions, Inc. ("Experian"), published a consumer credit report to Carriere which listed each of the three Proponent accounts as having a status of "charged off." (Complaint, ¶ ¶ 28, 29). The report listed inquiries which had been made by several creditors. (Complaint, ¶ 32). Carriere immediately contested and disputed the inaccurate loan reports to Experian. (Complaint, ¶ 30). Subsequently, Experian notified Proponent of the dispute. (Complaint, ¶ 33).

**\*2** On November 23, 2002, Experian issued a post-investigation communication to Carriere which indicated that Proponent had partially corrected some of the inaccurate information contained in Carriere's credit report. (Complaint, ¶ 35). However, subsequent Experian credit reports showed that the account information had not been corrected, and that Proponent had "persisted" in reporting the accounts as originally shown. (Complaint, ¶ 36).

Subsequently, Carriere contacted Experian to re-dispute the Proponent reportings. (Complaint, ¶ 38). On December 11, 2002, Experian issued a post-reinvestigation communication and a copy of an updated consumer credit report to Carriere. (Complaint, ¶ ¶ 39, 40). The credit report still contained the same Proponent reportings, which were designated with a "pre-dispute status." (Complaint, ¶ ¶ 41, 42). Additionally, the credit report listed an inquiry by Iberia Bank, which had received a credit report containing the disputed Proponent reportings. (Complaint, ¶ 43).

On April 2, 2003, Experian sent another post-reinvestigation communication to Carriere indicating that it had reinvestigated four Proponent accounts, and that it had verified the account reportings as shown and "updated" the fourth Proponent account. (Complaint, ¶ 44). This credit report reflected additional inquiries from creditors, who had received credit reports containing inaccurate information regarding the Proponent accounts. (Complaint, ¶ 45).

On April 30, 2002, Experian sent a credit report to Carriere which still listed the Proponent accounts. (Complaint, ¶ 46). After receiving the April 30, 2002 report, Carriere continued to contest the Proponent reportings to Experian in an attempt to have his credit reports corrected. (Complaint, ¶ 47, 50).

On May 16, 2003, Experian issued a credit report to Carriere which continued to show the Proponent reportings. (Complaint, ¶ 52). This report also showed additional inquiries by Experian subscribers who received credit reports containing the disputed Proponent information. (Complaint, ¶ 53).

After Carriere continued to protest the errors, Experian sent a post-reinvestigation communication on June 1, 2003, which indicated that Experian had verified the accuracy of the Proponent reportings. (Complaint, ¶ ¶ 54, 55). However, Proponent "insisted" that the accounts list a status of "charged off" and "past due" as to account number 44305148008. (Complaint, ¶ 56). Additionally, despite the fact that Carriere had not filed a Chapter 13 bankruptcy, Proponent "insisted" that the account for the second car loan show a status of "Petition for Chapter 13," "Filed Chapter 13 Bankruptcy 12/24/97," and "past due 180 days." (Complaint, ¶ 57). Further, Proponent "insisted" that the account for the first car loan list a status of "Paid/Account Charged Off" and "Charged off as of 6-1999 to 9-1999." (Complaint, ¶ 58).

On May 13, 2003, Carriere wrote to Proponent regarding the disputed information on his credit reports. (Complaint, ¶ 59). Proponent's counsel, Edward McKenna, responded to the letter and denied any inaccuracies with the reportings. (Complaint, ¶ 60). Additionally, Keith Beith of Proponent threatened Carriere "repeatedly" to insure that his credit reports would contain the information "indefinitely." (Complaint, ¶ 61). Since then, Proponent has continued to re-insert the disputed data into his consumer reports. (Complaint, ¶ ¶ 64, 65).

**\*3** Based on the inaccurate information regarding the Proponent accounts contained in his credit reports, Carriere contends that he has received "very low credit scores" from Experian, which has resulted in "adverse action," credit denials and "other damages" to him and his wife. (Complaint, ¶ ¶ 62, 63, 67, 68, 69). He also asserts that Proponent has violated the automatic stay and discharge order from the bankruptcy proceeding by continuing to publish this disputed information. (Complaint, ¶ 66). Further, he alleges that Proponent "recklessly, maliciously and/or intentionally" published this inaccurate information with "reckless disregard for the truth of the matter asserted." (Complaint, ¶ 71)

On October 13, 2003, Carriere filed suit in this Court asserting Louisiana state law claims for negligence, defamation, invasion of privacy, and violation of the

Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La.R. S. 51:1401, *et seq.* He further alleged federal claims for violation of the bankruptcy discharge order, and violation of the Fair Credit Reporting Act ("FCRA") under 15 U.S.C. § 1681s-2(b).

On May 6, 2004, Proponent filed the instant motion to dismiss on the following grounds: (1) the state law claims are preempted by the FCRA; (2) Proponent is exempt from LUTPA; (3) plaintiff fails to state a claim for violation of the bankruptcy discharge order; and (4) the state law and FCRA claims have prescribed.

*Preemption Under the FCRA*

Carriere has asserted a claim under § 1681s-2(b) of the FCRA, which section explains the responsibilities of furnishers of credit information after they have been notified by a credit reporting agency that the consumer disputes the credit information provided by the furnisher. *Thomasson v. Bank One, Louisiana, N.A.,* 137 F.Supp.2d 721, 723 (E.D.La.2001). Upon receiving notice of a dispute, the furnisher is to conduct an investigation and report the results to the appropriate consumer reporting agencies. *Id.* While the Fifth Circuit has declined to reach the issue of whether a private cause of action exists against a furnisher of information if it does not comply with § 1681s-2(b), numerous courts, including the Ninth Circuit and this Court, have concluded that it does. [FN2] *Young v. Equifax Credit Information Services, Inc.,* 294 F.3d 631, 638-39 (5th Cir.2002) (stating in dicta that the FCRA appears to impose civil liability on "any person" violating a FCRA duty under § 1681s2- (b)); *Nelson v. Chase Manhattan Mortgage Corp.,* 282 F.3d 1057 (9th Cir.2002); *Whitesides v. Equifax Credit Information Services, Inc.,* 125 F.Supp.2d 807, 812 (W.D.La.2000) (Walter, J.); *McMillan v. Experian Info. Serv., Inc.,* 119 F.Supp.2d 84, 88 (D.Conn.2000); *Olexy v. Interstate Assurance Co.,* 113 F.Supp.2d 1045, 1047-48 (S.D.Miss.2000); *DiMezza v. First USA Bank, Inc.,* 103 F.Supp.2d 1296, 1300 (D.N.M.2000); *Dornhecker v. Ameritech Corp.,* 99 F.Supp.2d 918, 927 (N.D.Ill.2000); *Campbell v. Baldwin,* 90 F.Supp.2d 754, 756 (E.D.Tex.2000); *Vazquez-Garcia v. Trans Union de Puerto Rico,* 222 F.Supp.2d 150, 155 (D. Puerto Rico 2002); *Mendoza v. Experian Info. Solutions, Inc.,* 2003 WL 2005832 (S.D.Tex. Mar. 25, 2003). *But see Carney v. Experian Info. Solutions, Inc.,* 57 F.Supp.2d 496, 502 (W.D.Tenn.1999) (finding statutorily created obligation imposed on furnisher is owed only to consumer reporting agency and not to

consumer).

> FN2. The enforcement of violations of § 1681s-2(a), which is not at issue here, is limited to certain federal and state officers. *Banks v. Stoneybrook Apartment,* 2000 WL 1682979 (M.D.N.C. June 1, 2000).

**\*4** Proponent agrees that a consumer has a private right of action for the enforcement of § 1681s-2(b). However, it argues that Carriere's claims for negligence, defamation, invasion of privacy and deceptive trade practices are preempted by the FCRA.

The FCRA has two preemption provisions: § 1681t(b)(1)(F) and § 1681h(e). Section 1681t(b)(1)(F) provides that "[n]o requirement or prohibition may be imposed under the laws of any State with respect to any subject matter regulated under *section 1681s-2* of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies." (emphasis added). This section provides exceptions for portions of the Massachusetts and California codes. 1681t(b)(1)(F)(i) and (ii).

Section 1681h(e), which also addresses a plaintiff's ability to bring state-law claims, provides that:
"no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against ... any person who furnishes information to a consumer credit reporting agency, based on information disclosed pursuant to section *1681g, 1681h,* or *1681m* of this title ... based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer." (emphasis added)

The question of preemption of state-law tort claims under the FCRA has not yet been addressed by a Circuit Court. *McCloud v. Homeside Lending,* 309 F.Supp.2d 1335, 1340 (N.D.Ala.2004); *Bank One, N.A. v. Colley,* 294 F.Supp.2d 864, 868 (M.D.La.2003); *Carlson v. Trans Union, L.L.C.,* 259 F.Supp.2d 517, 520 (N .D. Tex.2003). However, several district courts have considered how to apply the preemption provisions to pendent state law claims, and have taken three different paths.

The first approach regards § 1681t(b)(1)(F), which was added to the FCRA after § 1681h, as completely

Page 4

subsuming § 1681h(e). *See, e .g., Hasvold v. First USA Bank, N.A.,* 194 F.Supp.2d 1228, 1239 (D.Wyo.2002); *Jaramillo v. Experian Information Solutions, Inc.,* 155 F.Supp.2d 356, 363 (E.D.Pa.2001), *reconsideration granted in part,* 2001 WL 1762626 (E.D. Pa. June 20, 2001). This approach, which would call for preemption of all pendant state law claims, has been rejected by several courts on the ground that Congress left § 1681h(e) in place when it added § 1681t(b)(1)(F). *McCloud,* 309 F.Supp.2d at 1340; *Vazquez-Garcia,* 222 F.Supp.2d at *Jeffrey v. Trans Union, LLC,* 273 F.Supp.2d 725, 727 (E.D.Va.2003); *Stafford v. Cross Country Bank,* 262 F.Supp.2d 776, 786 (W.D.Ky.2003).

Under the second approach, § 1681h(e) is read as applying only to torts, while § 1681t(b)(1)(F) is read as applying only to state statutory regulation. *McCloud,* 309 F.Supp.2d 1335; *Carlson,* 259 F.Supp.2d at 521; *Yutesler v. Sears Roebuck and Co.,* 263 F.Supp.2d 1209 (D.Minn.2003). This has been referred to as the "minority view." *McCloud,* 309 F.Supp.2d at 1341-42.

**\*5** The third approach, called the temporal approach, has been applied by the majority of courts. *Bank One,* 294 F.Supp.2d at 869; *Vasquez-Garcia,* 222 F.Supp.2d at 162; *Aklagi v. Nationscredit Financial,* 196 F.Supp.2d 1186 (D.Kan.2002); *see also Jeffrey,* 273 F.Supp.2d at 726-27. Under the temporal analysis, preemption of state law claims arising *before* the furnisher of information receives notice of the dispute is governed by § 1681h(e), and preemption of state law claims arising *after* such a time is governed by § 1681t(b)(1)(F). (emphasis added). *Bank One,* 294 F.Supp.2d at 869.

Proponent argues that this Court should adopt a fourth approach, which combines the elements of approaches two and three. Defendant, citing *Stafford v. Cross Country Bank,* 262 F.Supp.2d 776, 786-88 (W.D.Ky.2003), urges that § 1681t(b)(1)(F) preempts all state law claims, *both statutory and tort,* arising after a furnisher receives notice of a dispute from a credit reporting agency. (emphasis added). For state tort law claims arising *before* a furnisher receives notice of a dispute, § 1681h(e) applies. *Id.* at 788.

While the Fifth Circuit has not addressed the question of preemption of state common law claims under the FCRA, district courts within this Circuit, including this Court, have. In *Whitesides, supra,* Judge Walter found that plaintiff's claims for negligence, defamation, intentional infliction of emotional distress, unfair trade practices and violation of § 1681s-2(b) of the FCRA were not precluded by § 1681h(e) because defendant's acts did not fall within the disclosures set forth under the statute. [FN3]

> FN3. The Court did not address preemption under § 1681t(b)(1)(F).

To reiterate, § 1681h(e) provides that "no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against ... any person who furnishes information to a consumer credit reporting agency, based on information disclosed pursuant to section *1681g, 1681h,* or *1681m* of this title ... based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer." (emphasis added). Judge Walter analyzed these disclosure provisions, and noted that §§ 1681g and 1681h refer to disclosures made by a consumer reporting agency, which defendant, Bank of Louisiana ("BOL"), was not. Additionally, he observed that while § 1681m applies to information users, it imposes no duty to disclose absent "adverse action" [FN4] by the user against the consumer. Since there was no adverse action taken by BOL against Whitesides based on her consumer report, he found that § 1681m was also inapplicable.

> FN4. Adverse action is defined under 15 U.S.C.A. § 1681a(k) as follows:
> (1) Actions included.--The term "adverse action"--
> (A) has the same meaning as in section 1691(d)(6) of this title; and
> (B) means--
> (i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance;
> (ii) a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee;
> (iii) a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section

1681b(a)(3)(D) of this title; and
(iv) an action taken or determination that is--
(I) made in connection with an application
that was made by, or a transaction that was
initiated by, any consumer, or in connection
with a review of an account under section
1681b(a)(3)(F)(ii) of this title; and
(II) adverse to the interests of the consumer.
Section 1691(d)(6) of Title 15 defines
"adverse action" as follows: "[f]or purposes
of this subsection, the term 'adverse action'
means a denial or revocation of credit, a
change in the terms of an existing credit
arrangement, or a refusal to grant credit in
substantially the amount or on substantially
the terms requested. Such term does not
include a refusal to extend additional credit
under an existing credit arrangement where
the applicant is delinquent or otherwise in
default, or where such additional credit
would exceed a previously established credit
limit."

Additionally, Judge Walter noted that § 1681h(e)
was not actually a preemption provision, but rather, a
"quid pro quo grant of protection for statutorily
required disclosures." *Id.* at 811 (quoting *McAnly v.
Middleton & Reutlinger, P.S.C.,* 77 F.Supp.2d 810,
814 (W.D.Ky.1999)); *see also Yeager v. TRW,* 984
F.Supp.2d 517 (E.D.Tex.1997)). As explained in
*McAnly:*

*6 "Since various parts of the federal statute
require consumer reporting agencies and
information users to disclose information to
consumers under certain circumstances, this
section guarantees that the agencies or users cannot
be sued for those required disclosures under state
tort law. It makes sense that acts required to be
done by the FCRA are immunized from state tort
liability."
*Id.* at 814-15.

Judge Walter found that BOL's actions, particularly
the reporting of the Whitesides' account, did not fall
within the scope of the disclosures considered by §
1681h(e). Thus, § 1681h(e) did not preclude any of
Whiteside's claims. *See also* 16 C.F.R. Pt. 600,
Appendix--Commentary on the Fair Credit Reporting
Act, § 610--Conditions of Disclosure, ¶ 6 ("The
privilege extended by [§ 1681h(e) ] does not apply to
an action brought by a consumer if the action is based
on information not disclosed pursuant to sections
[1681g, 1681h, or 1681m] )."

As in *Whitesides,* the disclosure provisions
referenced in § 1681h(e) do not apply in this case.
Because Proponent is not a consumer reporting
agency, it does not fall within the scope of § § 1681g
and 1681h. Further, § 1681m is inapplicable, as
Proponent took no "adverse action," *i.e.,* denying or
revoking credit, to Carriere. Accordingly, under
*Whitesides,* § 1681h(e) does not preclude Carriere's
claims.

In any event, were the Court to adopt this fourth
approach, as recommended by Proponent, the
undersigned cannot discern, based on the current
state of the pleadings, whether the actions
complained of by Carriere arose *before* or *after*
Proponent received notice from a credit reporting
agency of a dispute. As Proponent concedes
(regarding the defamation and invasion of privacy
claims), whether Proponent is entitled to qualified
immunity under § 1681h(e) "must be addressed with
evidence in a motion for summary judgment--not in
this Rule 12(b)(6) motion." (Document No. 11, pp.
18, 19). Thus, regardless of the approach ultimately
taken by this Court, the undersigned cannot
recommend dismissal of plaintiff's tort claims before
discovery has been conducted. *See Mendoza, supra,*
at *4; *Woltersdorf v. Pentagon Federal Credit Union,*
2004 WL 1252689 at *4 (N.D. Ala. April 2, 2004)
(suggesting that defendant move forward with a
motion for summary judgment once it was able to
produce evidence supporting its preemption
argument).

Accordingly, the undersigned recommends that the
motion to dismiss for preemption be DENIED.

### Deceptive Trade Practices

Proponent argues that, as a federal credit union
chartered by the United States, it is exempt from
LUPTA, by operation of LSA-R.S. 51:1401, *et seq.*
Section 1406 of LUTPA contains an exemption
provision, which states as follows:

The provisions of this Chapter shall not apply to:
(1) Actions or transactions subject to the
jurisdiction of the Louisiana Public Service
Commission or other public utility regulatory body,
the commissioner of financial institutions, the
insurance commissioner, the financial institutions
and insurance regulators of other states, *or federal
banking regulators who possess authority to
regulate unfair or deceptive trade practices.*
(emphasis added).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**\*7** Credit Unions are regulated under Title 12, "Banks and Banking," and Title 15, "Commerce and Trade," of the United States Code. Under 15 U.S.C. § 57a(f)(1), credit unions are specifically regulated to prevent unfair or deceptive trade practices. This section provides that the National Credit Union Administration Board "shall prescribe regulations to carry out the purposes of this section [preventing unfair or deceptive acts or practices in or affecting commerce], including regulations defining with specificity such unfair or deceptive acts or practices, and containing requirements prescribed for the purpose of preventing such acts or practices." Thus, as a credit union which is regulated by a federal agency regarding unfair or deceptive trade practices claims, Proponent falls within LUTPA's exemption.

Carriere argues that LUPTA's exemption "is not broad enough for violations of the bankruptcy court orders." (Document No. 13, p. 16). However, the history and intent behind the exemption in R.S. 51:1406 is "to avoid duplication and exclude financial institutions which are regulated by other authorities as to unfair or deceptive trade practices." First Financial Bank, FSB v. Butler, 492 So.2d 503, 505 (La.App. 5th Cir.1986); see also Scott v. Bank of Coushatta, 512 So.2d 356, 364 (La.1987). As a credit union which is regulated with respect to unfair trade practices under titles 12 and 15 of the United States Code, Proponent falls squarely within the coverage of this exemption. Thus, the fact that Carriere is also asserting a claim for violation of the bankruptcy discharge order is irrelevant to this claim.

Accordingly, the undersigned recommends that Carriere's LUTPA claim be DISMISSED.

*Violation of Bankruptcy Discharge Order*

Proponent asserts that Carriere has failed to plead a violation of a discharge injunction under 11 U.S.C. § 524. Section 524(a)(2) provides that a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived."

Section 524(a)(2) protects the debtor from any formal or informal attempts to collect a personal liability. Walker v. M & M Dodge, Inc., 180 B.R. 834, 842 (W.D.La.1995). These attempts include: "(1) commencing an action on such debt; (2) continuing such an action already initiated; or (3)

employing process to collect on such debt, e.g., through the use of garnishment or attachment writs." Walker, 180 B.R. at 842 (quoting 3 Collier on Bankruptcy, ¶ 524.01). All informal actions to collect, including "telephone calls, letters, threats to collect or initiate legal action, intimidation intended to enforce payment, and personal contacts to collect or recover," are barred as well. Id. at 842-43. "Even a mere threat to enforce a surviving lien will violate the injunction if the evidence demonstrates that the threat is truly an effort to coerce payment." Id.

**\*8** In the complaint, Carriere alleged that Proponent "failed to comply with the bankruptcy discharge order," and that such acts and omissions in violating the discharge order were "willful, intentional and designed to cause harm to plaintiff." (Complaint, ¶ ¶ 89, 90). Alternatively, Carriere asserts that Proponent's acts in violating the order were "negligent." (Complaint, ¶ 91).

Proponent argues that Carriere failed to allege that it intended to "collect a debt" when it reported to credit reporting agencies that Carriere's loans had been "charged off." However, there is no requirement that plaintiff plead that the credit furnisher intended to collect a debt when it filed an adverse report. As noted by the court in Singley v. American General Finance, 233 B.R. 170 (S.D.Ga.1999), reconsideration denied, 236 B.R. 105 (Bankr.S.D. Ga. June 21, 1999), which was relied upon by Proponent, "[t]he Court is unable to conclude, based on the facts presented by Movant [for summary judgment] ... that Movant did not act with the intent to collect the debt from [plaintiff] when it made the report to the credit bureau." Id. at 173. In other words, until the parties have had an opportunity to conduct discovery, the Court cannot determine what Proponent's intent might have been when it reported that Carriere's debts had been "charged off." See also, In re Weinhoeft, 2000 WL 33963628, *2 (Bkrtcy.C.D.Ill.2000) ("even if it is shown that the Bank's reports to the credit-reporting agencies contain truthful information, such a report, if made with the intent to harass or coerce a debtor into paying a pre-petition debt, could be deemed a violation of the automatic stay. [citations omitted]. On this point alone, Debtors have clearly pleaded facts which, if proven true, would entitle Debtors to relief.").

Rule 8(e) of the Federal Rules of Civil Procedure provides that "[e]ach averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required." Subsection (f)

provides that "[a]ll pleadings shall be so construed as to do substantial justice." Proponent cites no authority to support its argument that plaintiff is required to plead that its adverse reporting was made "with the intent to collect" a debt. [FN5]

> FN5. For example, fraud or mistake is required to be pled with particularity under Rule 9(b), as is a reply to an Order under Rule 7(a). _Schultea v. Wood,_ 47 F.3d 1427, 1433 (5th Cir.1995).

Accordingly, the undersigned recommends that the motion to dismiss this claim be DENIED.

### Prescription

In its initial brief, Proponent argued that all of Carriere's state law claims and FCRA claims have prescribed. However, in the reply brief, defendant limited its prescription argument to all state law tort claims for negligence, defamation and invasion of privacy  [FN6] arising before October 14, 1992, and FCRA claims arising prior to October 14, 2001.

> FN6. As the undersigned has recommended that Carriere's LUTPA claims be dismissed, the prescription issue relating to this claim will not be addressed in this section.

Under Louisiana law, tort claims are subject to a one-year prescriptive period, which commences to run for the day injury or damage is sustained. _LSA-C.C. Art. 3492._ FCRA's prescription period is found in Section 1681p, which provides as follows:

**\*9** An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within two years from the date on which the liability arises, except that where a defendant has materially and willfully misrepresented any information required under this subchapter to be disclosed to an individual and the information so misrepresented is material to the establishment of the defendant's liability to that individual under this subchapter, the action may be brought at any time within two years after discovery by the individual of the misrepresentation.

Carriere argues that the statute of limitations for a

violation of §  1682s-2(b) begins to run each time a credit agency issues an inaccurate consumer report, citing _Hyde v. Hibernia Nat. Bank in Jefferson Parish,_ 861 F.2d 446 (5th Cir.1988). In _Hyde,_ the court held that "the limitations period for a suit asserting negligence [under the FCRA] commences when a report issued to a user causes injury to the consumer for whose protection the Act was adopted and that the limitations period for a suit asserting intentional violation of the Act begins at the same time or, if the consumer is not aware of the issuance of the report, when the consumer later discovers it." _Id._ at 446.

In the reply brief, Proponent argues that the discovery rule expressed in _Hyde_ was rejected by the Supreme Court in _TRW, Inc. v. Andrews,_ 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). There, the plaintiff, citing _Hyde,_ argued that liability under the FRCA arises only when actual damages materialize. However, the Supreme Court did not reach this issue "because it was not raised or briefed below." _Id.,_ 534 U.S. at 34, 122 S.Ct. at 451.

Since _TRW,_ the Fifth Circuit has reaffirmed its holding in _Hyde_ that  "the republication of credit information resulting in a new denial of credit constitutes a distinct harm and thus gives rise to a cause of action that is separate from that arising from the original publication." _Young,_ 294 F.3d at 636. In so holding, _Young_ referenced the similar rule of Louisiana law regarding defamation, which states that "each subsequent publication of a defamatory statement is a new and separate delictual cause of action." _Id._

In _Whitesides,_ this Court, following _Hyde,_ determined that each time that a potential creditor requested a plaintiff's credit report and each time credit was denied based on erroneous information contained in the report, "the statute of limitations began to run anew for each potential harm." 125 F.Supp.2d at 807. Here, however, the Complaint does not specifically indicate the dates on which Carriere was denied credit. (Complaint, ¶  62). Thus, until discovery has taken place, the Court is unable to determine when the statute of limitations began to run for each alleged adverse action.

**\*10** Accordingly, the undersigned recommends that the motion to dismiss on the basis of prescription be DENIED.

### CONCLUSION

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 8
2004 WL 1638250 (W.D.La.)
**(Cite as: 2004 WL 1638250 (W.D.La.))**

Based on the foregoing reasons, the undersigned recommends that the Motion to Dismiss be GRANTED IN PART AND DENIED IN PART, and that all claims asserted by plaintiff under the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La.R. S. 51:1401, *et seq.* be DISMISSED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION,* 79 F.3D 1415 (5TH CIR.1996).

2004 WL 1638250 (W.D.La.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works